# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 17, 2010 Session

## ROBERT L. LEACH, JR. v. STATE OF TENNESSEE

**Criminal Court for Davidson County**
**No. 99-D-2508   J. Randall Wyatt, Jr.**

---

**No. M2008-02386-CCA-R3-PD - Filed June 4, 2010**

---

The Appellant was convicted of two counts of first degree murder, one count of especially aggravated robbery and one count of aggravated rape.  He was sentenced to death for each murder conviction.  He received consecutive twenty-five year sentences for the especially aggravated robbery and aggravated rape.  His convictions and sentences were affirmed on direct appeal.  See State v. Leach, 148 S.W.3d 42 (Tenn. 2004).  The Appellant subsequently petitioned for post-conviction relief, which was denied by the trial court.  He now appeals from the denial of post-conviction relief.  On appeal, he argues numerous violations of his constitutional rights during his trial proceedings, including denial of the effective assistance of counsel.  After careful review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Paul J. Bruno and Kathleen G. Morris, Nashville, Tennessee, for the appellant, Robert L. Leach. Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General and Jennifer L. Smith, Assistant Attorney General; Victor S. Johnson, District Attorney General, for the appellee, State of Tennessee.

## BACKGROUND

The Appellant was convicted in February 2001 of two counts of premeditated first degree murder (two convictions for felony murder merged), one count of especially aggravated robbery, and one count of aggravated rape.  On July 8, 1999, the Appellant killed

and raped Sarah McBride, sixty-nine years of age, and killed her cousin, Jean Poteet, seventy years of age, in their home in Nashville. The Appellant stole jewelry and other items from the house and that same day fled to Missouri in McBride's pickup truck. The Appellant was sentenced to death for the murder convictions. The jury found three aggravating circumstances as to each victim: the Appellant was previously convicted of one or more felonies whose statutory elements involve the use of violence; the murders were especially heinous, atrocious and cruel in that they involved torture or serious physical abuse beyond that necessary to produce death; and the murders were committed during the commission of rape and robbery. Tenn. Code Ann. § 39-13-204(i)(2), (5) and (7). The jury also found a fourth aggravator as to Poteet's murder: the victim was seventy years of age or older or was particularly vulnerable due to a significant handicap or disability. Tenn. Code Ann. § 39-13-204(i)(14). The Appellant received two consecutive twenty-five year sentences for the robbery and rape convictions. The facts of the case were summarized by the supreme court in its opinion on direct appeal:

> The State's proof at trial showed that Leach arrived by bus in Nashville in June 1999. Leach had left Missouri to pursue a career in music and to avoid revocation of his parole on a Texas burglary conviction. By early July 1999, he was working as a server at a Denny's restaurant in south Nashville and living at a nearby Econo Lodge hotel.
>
> Around 3:00 a.m. on July 8, 1999, Leach forced his way into the room of Dorianne Brown, an Econo Lodge employee who lived at the hotel, and started to choke her. When someone knocked on the door, Leach pulled out a knife and told Brown not to say anything. After the person at the door left, the telephone rang and distracted Leach. Brown ran out of the room to the hotel office and asked for the police to be called. When the police arrived, Leach was gone.
>
> Around 7:00 a.m. that same morning, Louise Howard telephoned her sister, Sarah McBride, a sixty-nine-year-old widow who lived about a mile from the Econo Lodge. McBride's cousin, seventy-year-old Jean Poteet, was staying with McBride. As a result of a stroke suffered at birth, Poteet had diminished mental capabilities and her right hand and right leg were partially paralyzed. Poteet wore a leg brace from her knee to her ankle. McBride indicated on the telephone that there was a man in her kitchen drinking coffee while he waited for his sister to pick him up. Howard told McBride, "Sarah, get that man out of the house, and put him on the patio." McBride responded, "Okay. I'll call you later." Howard left to go shopping. When Howard returned, she was unable to reach McBride by telephone and went to McBride's house around

2

1:00 p.m. The garage door was up, and McBride's 1982 Dodge truck was missing. The back door to the house was open. Howard went inside and discovered the bodies of Poteet and McBride.

Poteet's wig and a pair of scissors were on the kitchen floor next to the table. A trail of blood led from the kitchen to the doorway of the master bedroom where Poteet was lying face down with her blouse pulled up and knotted around her throat. A pair of black jeans was next to Poteet's head. McBride was lying on her back on the bed. She was naked from the waist down, and her legs were open and bent up over her body. A belt was tightened around her neck. Both women had been stabbed and showed signs of blunt trauma to the head.

Dr. Bruce Levy, the Davidson County Medical Examiner, was called to the scene by the police and performed autopsies on the victims the following day. Dr. Levy determined that both women died as a result of ligature strangulation. Dr. Levy opined that the ligature had been placed around Poteet's neck in the kitchen and that she had been dragged to the bedroom while she was still alive. Congestion in her upper chest and face indicated that someone was sitting on her lower chest or abdomen when tying the ligature around her neck. Poteet had defensive wounds and also had suffered blunt force injuries to her face. She had been hit at least twice with enough force to cause bleeding to her brain. Like Poteet, McBride had suffered defensive wounds and had two sets of paired puncture wounds consistent with her being stabbed with scissors. McBride also had suffered multiple blunt force injuries to her head, including a laceration over her left eyebrow. Her nose, the bone between her eyes and brain, her breast bone, and three of her ribs had been broken. She suffered a laceration to her vaginal wall. Dr. Levy determined that McBride had been sexually assaulted and had died during the attack. Bruising on her ankles indicated that her legs were held during the rape.

The police investigation showed that someone had rummaged through the house. Chest drawers were pulled out, closet doors were open, a mattress had been moved, and jewelry boxes lay open. Bloody footprints were on the floor in the entrance hall and living room. A pair of socks was found in the sink in the bathroom off the master bedroom. A pair of men's underwear was later retrieved from the sewer line running from the toilet. McBride's purse and jewelry were missing as was the Dodge truck.

3

Forensic testing showed that Leach's left palm print was on a wall in McBride's house and that Leach's fingerprints were on a coffee mug on the kitchen table. After Leach's arrest, it was determined that bloody footprints from the floor in McBride's house matched Leach's tennis shoes and that sperm on the vaginal swab from McBride matched Leach's DNA.

Around 8:00 p.m. on July 8, Leach appeared in the area of Greenville, Missouri, driving McBride's truck. Leach went to the home of a friend, Harold Winberry, and announced that he had just come from Nashville. Leach, Winberry, Winberry's wife, and her sister, Becky Allen, went to the Friendly Tavern in Greenville, where they drank, danced and socialized until 2:00 a.m. Leach and Allen slept together that night and the next. Leach gave Allen a pair of McBride's earrings. Leach also stayed at the home of his aunt, to whom he offered McBride's leaf blower. During this time, Leach behaved normally, visited with other people, played his guitar and sang, and showed off the Dodge truck, claiming it was his own vehicle.

After Leach's identification had been confirmed by fingerprint evidence, Detective Mike Roland of the Nashville Police Department contacted Leach's sister, Cathy Watson, who lived in Missouri. Watson in turn contacted Leach, who called Detective Roland on July 13. During the telephone call, Leach blamed all his problems on the Texas prison and parole system and threatened to go to Texas and "blow up a whole city block." Detective Roland had the call traced to a pay telephone in Wayne County, Missouri, where law enforcement officers were put on the alert for McBride's truck. Shortly thereafter, the truck was located outside the Friendly Tavern. Leach was inside playing guitar on the stage. After he was arrested, Leach said that he "was sorry he did it, but something just snapped." He claimed that he had been trying to get help for the past three years.

Detective Roland interviewed Leach in Missouri. Leach denied knowing anything about McBride and Poteet, but he talked to Roland about the incident with Brown at the Econo Lodge. Leach claimed that he had been drinking heavily that night and said that he had been talking to Brown in her room when a man came to the door and tried to rob him. Leach struck the man. When Brown screamed and ran out of the room, Leach also fled. Leach had no memory of what happened after he left the motel until he "came to" driving the Dodge truck in Illinois and wearing someone else's clothes. Leach said that at most he had stolen the truck and asserted that he would never hurt anyone except in self-defense. Nonetheless, during the interview, Leach remarked, "If

4

I deserve it, I deserve it." He also told Roland that he had suffered headaches, black-outs, and memory loss ever since a metal plate had been put in his head after an automobile accident. During the trip back to Nashville, Leach pointed to the road where he had thrown away McBride's purse.

Joseph Walker, a convicted felon, met Leach while they were housed together in the Davidson County Jail in late December 1999. Walker testified that Leach asked Walker about the insanity defense. Leach stated that he was trying to go to a psychiatric facility because it would be easier to escape and flee to Canada, which would not extradite him if he was facing a death penalty. According to Walker, Leach related the following details of the murders. Leach told the women that his car was broken down and that he needed to call for a ride. One of the women recognized him from Denny's and offered him a cup of coffee. She received a telephone call instructing her to get him out of the house. He put a choke hold on one or both of the women, got them down on the floor, and beat their heads. He raped one woman and fondled the other. He went through the house, took some jewelry, went to the garage, took some lawn care equipment, and then left in a truck. Leach told Walker that there was blood all over the house. Leach also said that he had always had a secret fantasy of committing multiple rapes and homicides.

The only witness for the defense was Leach. He testified at length about his life before the murders. His parents separated when he was an infant. Leach rarely saw his father whom he described as a "cattle rustler." His father sometimes took Leach with him to commit burglaries. Leach said that his mother had a drinking problem and "hung out at the tavern." Leach related a history of sexual abuse by several people, including his babysitter, a neighbor, a stranger, and a stepbrother. Until Leach was fourteen, he had a bowel problem and would defecate in his pants almost every day. His mother would punish him by rubbing his nose in his feces; other children would tease him.

Leach admitted that when he was a child he set fires and was generally disruptive. He was placed in state custody at ten or eleven and was eventually transferred to a state hospital school at twelve. He quit school after the eighth grade. At fourteen he burglarized the same gas station four nights in a row and was sent to reform school for two years. After his release, he stayed with his father for only a month, traveled with a carnival for three months, and then moved back with his mother and grandmother. He returned to reform school for a year and was again released. When he set fire to a laundromat, he was placed in a mental hospital for evaluation and received a year in jail. When he

5

was released, he broke into a house and set fire to it. Leach testified that he never burned anything after that incident.

In his late teens, Leach went to Texas, then to New Orleans, and back to Missouri to his mother. He became a Christian and worked at a Christian camp for a year and one-half. Leach testified that he left the camp at nineteen after he "fell away from God." After moving back to Missouri, he committed a robbery and served two years in prison before being paroled. He went to Texas, where he was convicted of burglary and sentenced to seven years on probation. He violated probation and was sent to a Texas prison, where he was gang raped.

Leach was on parole from 1988 until 1992. During that time, he bought a house and worked in the heating and air conditioning business. In 1993, he was in an automobile accident and had a metal plate put in his head. He violated parole and returned to prison for three and one-half years. While incarcerated, Leach was transferred from prison to prison. He described the Texas prisons as violent places full of beatings, killings, and rapes.

In February 1997, he was again released on parole and lived with his sister in Missouri until he felt that he was about to "snap" and went to live alone in the woods. Leach claimed to have won Star Search in 1997 and then to have gone to Branson, Missouri, where he was doing well until December 1998, when he was arrested for assault and resisting arrest. He was threatened with revocation of parole unless he participated in alcohol treatment. Although he successfully graduated from treatment, he continued to have trouble with his parole officer, and a parole violation warrant was issued against him. Frightened of returning to prison in Texas, Leach hid in the woods and took a bus to Nashville in June 1999.

Leach gave the following testimony concerning the events of July 8, 1999. Prior to that time, he had been suffering from headaches and depression until he felt "just like exploding." He said that he had gone out to drink after work, became intoxicated, and returned to the motel, where he saw Brown. He knocked on her door and went into her room, where they talked for several minutes. As he turned around to leave, "something controlled" him, and the next thing he knew he was on top of her. Brown pleaded with him not to hurt her, and he promised that he would not. A man knocked on the door. Afraid that the man would hurt him, Leach pulled out his pocket knife. The man left, but then the telephone rang. When Leach dove at Brown as she moved toward

6

the telephone, Brown ran out the door. Leach fled until he came to an apartment complex, where he spent the rest of the night sleeping in the shrubbery.

When Leach awoke, he was angry and stressed. He went to a pay telephone at a convenience store to call his sister but left when a police officer arrived. As he walked along, he saw McBride watering flowers in her yard. Leach told McBride that his car had broken down and asked to use her telephone to call his sister. When his sister did not answer, Leach wanted to "buy time" and made up a story that his sister was on her way to get him. Leach drank some coffee while sitting with McBride on the front porch. When the telephone rang, McBride told Leach to go into the kitchen and get himself another cup of coffee while she answered the call. Leach saw Poteet sitting in the kitchen. Leach testified,

> I don't know what happened. I-I-the same thing at the hotel. It's something came over me. I heard a loud bang. The next thing I know I had Ms. Poteete [sic] in my arms. When I realized what had happened, I let go of her as she dropped to the floor. And I freaked out. I didn't understand it because I didn't plan it. And I heard a slam of a door. And I turned around and it was Ms. McBride, or that's her name, I think. And I just-I went blank.

Leach stated that he woke up in the shower with water hitting his face. He did not know where he was and was horrified to see the victims' bodies. He changed out of his bloody clothes. He took McBride's jewelry box and purse. He went outside, thought about setting the house on fire but "just blew it off," and left in McBride's truck. He blacked out again and awoke under a bridge on the Kentucky-Missouri border. He then drove several miles in the wrong direction before turning around and heading to Greenville, Missouri. On cross-examination, Leach denied ever talking with Walker about the facts of the case and said that Walker approached him with the idea of an insanity defense.

Based upon the above evidence, the jury convicted Leach of first degree premeditated murder of Jean Poteet, first degree premeditated murder of Sarah McBride, first degree felony murder (during the perpetration of robbery) of Jean Poteet, first degree felony murder (during the perpetration of robbery) of Sarah McBride, especially aggravated robbery of Sarah McBride, and aggravated rape of Sarah McBride. The trial court merged the felony murder convictions with the premeditated murder convictions.

7

At the penalty phase, the State presented proof that Leach was convicted in August 2000 of reckless aggravated assault and in May 1983 of robbery in the second degree. The State recalled Dr. Levy, who repeated that Poteet was conscious when the ligature was applied and that the victims would have remained conscious for thirty to forty seconds until they died three to four minutes later. He described strangulation as a very painful form of death. Dr. Levy also testified that the scissor stab wounds suffered by both victims would have been painful. Dr. Levy further stated that, although McBride may have been unconscious when the belt was placed around her neck, she was conscious when beaten and would have suffered pain from the vaginal tear and injuries to her head and chest.

The State presented three victim impact witnesses. The first witness was McBride's older sister, Louise Howard. She testified that McBride enjoyed working in her yard. She said that McBride was her best friend and that they did things together almost daily. She expressed her deep grief at losing her sister. The next witness was Poteet's cousin and legal guardian, William Harris. He described his relationship with Poteet as almost that of a brother. He testified that Poteet had the mental capacity of a very bright child and had gone to school through the sixth or seventh grade. Despite her handicaps, she was an excellent housekeeper and had faithfully cared for her parents and Harris' mother until they died. The last witness for the State was McBride's stepson, Robert McBride. He testified that his father and McBride had been married for twenty-seven years until his father's death in 1992. Although McBride grieved for her husband, she had eventually come to enjoy life again. He stated that the murder had a horrible impact on him and related how his youngest daughter, who was eight when the killings occurred, wanted to avoid going near McBride's house.

In mitigation, the defense presented the testimony of several witnesses who corroborated Leach's account of his life before the murders. Leach's aunt, Jane Henson, testified that Leach's father had been a womanizer who cared nothing for his children and that Leach's mother was mean to Leach because he resembled his father. Another aunt, Judy Waltz, stated that Leach came to live with her when he was twenty-six or twenty-seven. He was very courteous, but she had to ask him to leave because of his drinking and his infatuation with her daughter. After he moved out, Leach had a successful roofing business but lost it because of his drinking. Leach's childhood friend, Richard Bennett, told how Leach's mother would beat Leach and punish him by putting him in a closet. Bennett described Leach as a troubled child, tortured by other children

8

because he was passive and soiled his pants. Bennett related that Leach frequented the home of a known pedophile when he was a child. Leach's sister, Cathy Watson, testified that, when Leach was paroled from the Texas prison in 1997, he had changed and was paranoid and scared. Watson also stated that on the morning of July 8, 1999, she had heard her telephone ring but did not answer it because she was sick.

Two other defense witnesses, Carol Duma and Reverend Harry Duma, testified about their contact with Leach. Mrs. Duma taught Leach in kindergarten and described him as fearful and apprehensive. Both testified about their positive experience with Leach when he worked for them at a Christian camp in his late teens. Leach seemed to do well, but at times he would "snap" and frighten people. Reverend Duma described Leach as "very, very lonely."

Another mitigation witness was Ann LaPoint, a nurse and licensed social worker from Texas, who counseled Leach for seven to eight years while he was on parole. LaPoint characterized Leach as immature, depressed, angry, needy, delusional, and suffering from low self-esteem. Describing him as "a five-year-old in a twenty or thirty-year-old body," she said that she had to teach Leach how to dress appropriately and comb his hair. She confirmed that Leach was afraid of going back to prison because he had been beaten and sexually assaulted there. She testified that Leach had tried to commit suicide by jumping off a bridge, hanging himself, and running his car into a bridge embankment. On cross-examination, LaPoint admitted that Leach had played mind games with her "like a typical substance abuser," had attempted to falsify a urinalysis, had trouble with authority, and "wanted to blame the world and society for his shortcomings instead of accepting responsibility for his actions."

State v. Leach, 148 S.W.3d 42, 47-52 (Tenn. 2004), cert. denied, 544 U.S. 966 (2005).

## POST-CONVICTION PROCEEDING

On September 2, 2005, with the assistance of the Office of the Post-Conviction Defender, the Appellant filed his petition for post-conviction relief. However, due to a conflict, alternate counsel were appointed to continue the representation throughout the remainder of the proceeding. New counsel developed concerns about the Appellant's mental competency. Accordingly, the post-conviction court allowed counsel time to have the Appellant evaluated. Presumably based upon the results of the evaluation, counsel ultimately decided not to pursue the competency issue. The Appellant filed an amended petition on

9

January 4, 2008. The court conducted a hearing on July 17, 2008, and issued its order denying post-conviction relief on October 8, 2008.

**Hearing**

The Appellant was represented at trial by the Office of the Davidson County Public Defender. Ross E. Alderman, the District Public Defender, Laura C. Dykes, Deputy Public Defender, and Amy D. Harwell, Assistant Public Defender, were assigned the case at trial. On appeal, the Appellant was represented by Assistant Public Defenders Jeffrey A. DeVasher and C. Dawn Deaner. Attorney Alderman served as lead counsel throughout trial but Attorney Harwell was primarily responsible for coordinating the mitigation proof for sentencing.

Maryann Hea, a licensed clinical social worker with the office, testified that she was assigned to gather mitigation information about the Appellant. Ms. Hea had been with the office for approximately eleven years. Ms. Hea interviewed the Appellant to obtain information about his background. Ms. Hea then gathered numerous records from the various educational, medical and penal institutions from the Appellant's past. Whenever she received any information, Ms. Hea would discuss it with the trial attorneys and place copies of the documents in the file.

Ms. Hea and Attorney Harwell worked together gathering mitigation information. Although she could not document the number of hours, Ms. Hea testified she spent "an awful lot of time" working on the case. On three occasions, Ms. Hea and Attorney Harwell traveled to Missouri during their investigation to interview people familiar with the Appellant. However, they did not visit Texas, where the Appellant had also lived. Ms. Hea also testified that they obtained educational, medical and criminal records relating to the Appellant from both Missouri and Texas. Ms. Hea said she did not know why she was not called as a witness during the penalty phase of the trial.

Attorney Amy Harwell graduated from the University of Tennessee College of Law in 1997, served as a judicial law clerk for a year, then joined the Davidson County Public Defender's Office. At the time of the post-conviction hearing, Attorney Harwell worked for the Office of the Federal Public Defender in Nashville with a focus on capital habeas corpus cases. She had been employed with the Davidson County Public Defender for about a year when she volunteered to assist with this case. Attorney Harwell acknowledged that she was not qualified under the Tennessee Supreme Court Guidelines to represent capital defendants. Prior to her involvement in this case, Attorney Harwell testified she did not have any experience defending a capital case. At the hearing, Attorney Harwell stated that her ability

10

to identify potential mitigating evidence in capital cases was much better after gaining more experience in the profession.

According to Attorney Harwell, the defense was focused on "sort of a modified diminished capacity by virtue of the fact that we didn't have a testifying expert." Because of her involvement in gathering mitigation evidence, Attorney Harwell was left in charge of handling those witnesses and developing a strategy for the penalty phase. However, Attorney Harwell maintained open communications with the other two attorneys throughout trial and, as the junior attorney, she deferred to their decisions regarding any defense strategy. During the hearing, Attorney Harwell was shown numerous documents and reports detailing the Appellant's life which the defense team obtained prior to trial. She stated that most, if not all, of the information contained in those reports should have been presented to the jury as mitigation evidence to corroborate the testimony of the witnesses.

Attorney Harwell was questioned about a report she obtained prior to trial which described the Appellant's childhood, stating that: the Appellant's parents divorced when he was two months old; he lived with his mother and stepfather until he was ten; a state agency removed him from the home sometime thereafter; his mother divorced again when the Appellant was fourteen; as a juvenile, the Appellant was charged with breaking and entering and placed in a youth center for eight months; after his release from the youth center, the Appellant was placed in foster care; the Appellant started drinking alcohol at age six and began using drugs at age twelve; the Appellant has an I.Q. of 74. Attorney Harwell stated that she did not, at that time, know how to introduce into evidence the actual written report, but she stated that the defense attempted to elicit the general character of the information from the witnesses they called to testify. According to Attorney Harwell, although the defense did not believe the Appellant's I.Q. score was relevant, she was not familiar with the Flynn Effect (improving test scores over time) and margins of error in testing. She believed the jury should have been made aware of the Appellant's I.Q. At the time of trial, Attorney Harwell believed that evidence about the Appellant's alcohol and substance abuse at an early age would do more harm than good, but she testified at the hearing that this type of information would have instead assisted the trier of fact in learning the complete story of the Appellant's development and should, therefore, have been presented to the jury.

Attorney Harwell was also questioned about a document which discussed the Appellant's behavior during his stay at a state school associated with a mental institution in Missouri when he was fourteen years of age. She testified that this information should also have been presented to the jury during sentencing because it demonstrated that the Appellant responded well in an institutional setting. In addition, Attorney Harwell believed that the jury should have been more informed about the fact that the Appellant lived in extreme poverty as a child. Attorney Harwell stated that the jury should have learned more about the

Appellant's lack of supervision and neglect as a child through the various documents the defense collected.

Attorney Harwell was shown several reports detailing the Appellant's bowel problems as a child. Attorney Harwell testified that the jury should have heard more about his condition and the fact that he was teased by his family and other children. The reports also include information about his parents' alcoholism and the physical abuse he suffered from his parents and siblings. One report shown to Attorney Harwell details the 1985 report of a psychologist which was prepared for a sentencing hearing. The 1985 report relayed further information about the Appellant's emotional neglect and physical abuse, discussed the Appellant's homicidal rage and depression, and stated that the Appellant is "psychologically crippled and has abused chemicals to ease the trauma . . . [and] coupled with his long history of institutionalization, it's not likely that his adjustment will ever be satisfactory outside of a setting which provides structure and supervision for him." The report also opined that the Appellant posed a threat to others and that his criminal behavior was likely to continue. Attorney Harwell testified that the report "would actually be a really good summary of what our mitigation theme and theory should have been, and to some extent was."

According to Attorney Harwell, the defense should have better focused the jury's attention during sentencing on the fact that the records showed that the Appellant behaved and performed well in an institutional environment. However, at the time of trial, Attorney Harwell perceived institutionalization as a bad thing in the eyes of the jury. She was shown two documents which detailed the Appellant's prevention of an attempted suicide by another prisoner and the Appellant's report to the warden about finding a potential weapon. Attorney Harwell testified that those were examples of documents which should have been shown to the jury.

Attorney Harwell conceded that, although she tried, she did not provide the Appellant with the effective assistance of counsel. During cross-examination, Attorney Harwell acknowledged that the evidence of the Appellant's guilt seemed overwhelming. She also acknowledged that the Appellant was evaluated by two clinical psychologists, but that there was no chance at an insanity defense. Attorney Harwell testified that the Appellant and the other seven witnesses relayed to the jury information about the Appellant's life, but she also testified that some information was not presented.

Ross Alderman was lead counsel in the case. He testified that he had been practicing criminal law since 1978. Both he and Attorney Dykes were qualified under the rules to serve as lead counsel in a death penalty trial. This was Attorney Alderman's third capital trial. However, he was involved in more than one hundred death eligible cases where notice of intent to seek the death penalty was never filed. Attorney Alderman said they worked

numerous hours investigating and preparing for trial. Their file in this case consisted of five boxes, and they were also provided open discovery to all of the prosecutor's files.

Attorney Alderman met the Appellant at the hospital after he attempted to hang himself in jail. The Appellant was subsequently transferred to Middle Tennessee Mental Health Institute for observation. Attorney Alderman oversaw the entire case while Attorney Dykes focused on the guilt phase and Attorney Harwell focused on the penalty phase. Attorney Alderman testified that his theory of defense was that this was not a first degree murder case but instead one of second degree murder at worst. Attorney Alderman testified about the extent of their pretrial investigation, which included: traveling to Missouri and interviewing witnesses; reviewing reports and other documents from the Appellant's past; and having the Appellant evaluated by mental health experts. Attorney Alderman personally reviewed every document collected.

Regarding a telephone interview the Appellant gave before being taken into custody, in which he admitted he would be found guilty and be executed, Attorney Alderman did not believe the conversation was as problematic as other statements the Appellant made and thus did not move to have it excluded. The Appellant also gave a statement to police after being arrested. At one point during the interview, the Appellant suggested that he did not want to continue talking. However, the interview continued. Attorney Alderman discussed the matter with the Appellant but ultimately decided not to file a motion to suppress. Attorney Alderman did not believe the Appellant was actually attempting to invoke his right to remain silent. Attorney Alderman did not believe, therefore, that a motion to suppress would have been granted. He testified, "at the time I did not think that this interaction was, in and of itself, was sufficient." If he believed there was a legal basis for filing a motion to suppress, Attorney Alderman said he would have filed one. Attorney Alderman also acknowledged that the statement was consistent with the Appellant's testimony at trial.

Attorney Alderman considered filing a motion for a change of venue. He continued monitoring the case's publicity through the end of jury selection, but testified that he ultimately did not observe anything which would justify moving the trial out of Davidson County. Attorney Alderman also decided to stay in Davidson County because of the general intelligence of the jury pool there. In fact, Attorney Alderman testified that they did not experience any problems during voir dire regarding pretrial publicity.

According to Attorney Alderman, there was no dispute about the facts of the case. Instead, the team focused on presenting a mental health or diminished capacity defense. Attorney Alderman testified that he initially gave notice that the defense would be relying upon the evaluations of several mental health experts: Dr. Keith Caruso, psychiatrist; Dr. Joan Sliker, psychiatrist; Dr. Kathleen Brogan, psychologist; Dr. Robert Kessler, radiologist;

and Dr. S. Paul Rossby. However, no mental health expert testified during trial because Attorney Alderman did not believe any of the experts' conclusions about the Appellant benefitted their case. Attorney Alderman did not want an expert to testify that the Appellant suffered from an anti-social personality disorder or a narcissistic personality disorder. Characteristics of anti-social personality disorder include repeated lying, reckless disregard for others and lack of remorse. Attorney Alderman did not want the jury to hear about those traits, especially when the Appellant planned to testify on his own behalf.

Dr. Keith Caruso, a psychiatrist, evaluated the Appellant but he was unable to provide a useful report for the defense. According to Attorney Alderman, Dr. Caruso would have placed more emphasis on his diagnosis of narcissistic personality disorder (the Appellant acted wilfully to gain notoriety) rather than that of post-traumatic stress disorder (the Appellant was suffering from extreme mental or emotional disturbance in response to his problem with the Texas Parole Board). The defense theory was that the Appellant did not act wilfully and, according to Attorney Alderman, Dr. Caruso's testimony would have hurt their case.

Dr. S. Paul Rossby was hired to determine whether the Appellant's serotonin levels could help explain his lack of impulse control. Attorney Alderman, however, decided not to call Dr. Rossby as a witness because he became increasingly uncomfortable with the reliability of Dr. Rossby's conclusions. According to Attorney Alderman, there was "sort of a void" in Dr. Rossby's resume which he was unwilling or unable to explain. "We had enough to try and defend without having to defend an expert who – who, potentially, wasn't doing a good job explaining why he thought this was important in Mr. Leach's defense."

Attorney Alderman decided that the Appellant would be the only witness called by the defense during the guilt phase. Attorney Alderman hoped the Appellant would convey to the jury what was going on in his mind when the crimes occurred. He also hoped the Appellant could "humanize" himself in front of the jury. However, Attorney Alderman did not remember why the defense did not attempt to introduce reports or documents to corroborate the Appellant's testimony. Attorney Alderman did not recall why the defense did not request a side bar when the trial judge directed Attorney Dykes to speed things along during the Appellant's testimony. Nor did he recall why the defense did not object to some of the allegedly inappropriate testimony of the victim's family during the guilt phase. Attorney Alderman stated he did not cross-examine witnesses testifying about forensic matters unless he thought he could "change the tenor" of the proof.

Attorney Alderman said the goal all along was to avoid a conviction of first degree murder. As such, he asked the jury during closing to find the Appellant guilty of second degree murder because he believed there was a lack of premeditation in the proof. Attorney

14

Alderman, however, did not recall why he did not request instructions on any other lesser charges of homicide. When asked why he requested an insanity instruction, Attorney Alderman replied that if the court gave an insanity instruction the jury would have at least thought about the defense theory that the Appellant was acting under mental duress.

During sentencing, Attorney Alderman remained lead counsel and made the ultimate decisions about the introduction of proof. He did not recall, however, why Ms. Hea was not called to testify. Regarding his decision not to introduce specific documents or reports, Attorney Alderman testified that all the information they wanted the jury to learn was presented through the testimony of the witnesses. Although he stated that one or two witnesses were not called because their testimony would have been cumulative, he further said that they called most of the favorable witnesses they were able to find.

Attorney Alderman was responsible for closing argument during sentencing and he testified that he prepared for it during the course of the trial. He acknowledged that the main purpose of a closing argument during sentencing is essentially to beg for a defendant's life. Attorney Alderman testified, however, that he did not give a closing argument in this case because he did not want the prosecutor to have the last word. According to Attorney Alderman, the particular prosecutor in this case utilized Power Point presentations which included photographs of the victims which were graphic and evoked the jurors' emotions. Attorney Alderman stated that his decision not to present a closing argument in this case was one of the most difficult decisions of his career.

Dr. James Walker, a neuropsychologist, testified on behalf of the Appellant. The Appellant retained him to review the medical and other records collected by the defense during their pretrial investigation. Dr. Walker also reviewed the transcripts of the trial and sentencing hearing. Dr. Walker was asked to determine whether he saw, from his review of those records, a different approach the defense could have taken in presenting mitigating evidence during sentencing. According to the trial court's pre-hearing order, Dr. Walker was not permitted to testify about any new diagnosis about the Appellant's mental condition. In fact, the Appellant refused to actually meet with Dr. Walker before the hearing.

Dr. Walker testified about the traits of anti-social personality disorder. According to Dr. Walker, the traits of a personality disorder develop in a person's childhood and continue throughout adulthood. A person with this diagnosis cannot conform his or her conduct to rules or laws. The person will tend to lie more than the average person in order to avoid culpability for his or her actions. In addition, the person has a reckless disregard for others, is more likely to re-offend, and lacks remorse. Someone who also suffers from a narcissistic personality disorder lacks empathy towards others, has a sense of entitlement, and

15

manipulates others to gain advantage. However, Dr. Walker stated that not everyone who is diagnosed with these disorders exhibits all of the traits associated with the disorder.

Dr. Walker testified that most people with an anti-social personality disorder also suffer from one or more other mental disorders. Dr. Walker determined that none of the other mental disorders, in addition to the anti-social personality disorder diagnosed by Dr. Caruso, would be considered serious. The other conditions included alcohol dependency, a substance-induced mood disorder, dysthymic disorder, and a narcissistic personality disorder. According to Dr. Walker, anti-social and narcissistic personality disorders are difficult to treat because they reflect patterns and behavior.

According to Dr. Walker, Dr. Rossby performed a test of the Appellant's cerebral spinal fluid to ascertain his serotonin level. Dr. Rossby concluded that the Appellant's serotonin level was only at the eleventh percentile. The Appellant's serotonin deficit, according to Dr. Walker, affected his ability to control his impulsive behavior. Dr. Walker stated that information about the relationship between low levels of serotonin and aggressive/violent behavior was known in the medical community at the time of the trial in this case.

The Appellant testified at the post-conviction hearing. The Appellant said he was gullible and easily persuaded to do things he did not want to do. The Appellant knew his childhood had been blamed for his actions but he stated that he overcame those problems. He stated that the abuses he endured by both the officials and other inmates in the Texas prison system were "the root of this crime." He said those abuses made him bitter and hateful. The Appellant stated: "And I know my childhood affects many a things of the way I am today. But I know the root of this crime is – is the abuse, because when I went into prison I didn't hate. You know, I didn't hate. I – I didn't think about revenge. And when I came out, I had all of these problems that I didn't have when I went in." The Appellant told Attorney Alderman that he wanted the defense to focus on those abuses rather than his troubled childhood. However, he did not think counsel did a good enough job doing so.

For example, the Appellant stated that he was arrested for no apparent reason while hitchhiking when he was fourteen years old and placed in custody for one year without the opportunity to see a lawyer. He also stated that while he was in prison another inmate attacked him and ruptured his spleen. The Appellant testified that the prisons in Texas are like "Nazi Camps" where they treat the prisoners like animals. He talked about the group showers the inmates were forced to take. The Appellant recounted an incident in which he was transferred by a prison bus which caught on fire.

16

The Appellant testified about his mother's death and how he was threatened with being in violation of the terms of his parole because he attended the funeral and did not report back for several days. The Appellant said he threatened to kill his parole officer. He also testified about how, after his father's death, he started drinking again and eventually ended up back in prison. Before he committed the crimes in this case, he was told that if he got into trouble again in Texas he would be sentenced to twenty-five years in prison.

The Appellant stated that he wanted to testify at trial so he could tell the jury about the problems with the Texas prison system. He also stated that he wanted counsel to file a motion for change of venue because of all the publicity surrounding the crimes. The Appellant admitted at the hearing that his trial testimony, when he told the jury he was raped by six people in prison, was a lie. He also admitted at the hearing that he did not black out when he committed these crimes.

The trial court filed a one hundred and ten page order detailing the testimony heard at the hearing and addressing each of the grounds for relief presented. The trial court concluded that the Appellant failed to satisfy his burden of proof. Accordingly, the trial court denied the petition.

### BURDEN OF PROOF AND STANDARD OF REVIEW ON APPEAL

The Appellant's petition is governed by the Post-Conviction Procedure Act. See Tenn. Code Ann. §§ 40-30-101 to -122. To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. See Tenn. Code Ann. § 40-30-103. The petitioner must establish the factual allegations contained in his or her petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(2)(f). Although the Appellant acknowledges that the Tennessee Supreme Court has "regularly reasserted" this standard of proof, the Appellant argues that this Court should "ignore the unconstitutional standard of proof required by the Tennessee Supreme Court." We simply point out that this Court is bound by the decisions of the Supreme Court of Tennessee. State v. Jefferson, 938 S.W.2d 1, 21 (Tenn. Crim. App. 1996). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App.1998).

Once the trial court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993). The Appellant has the burden of establishing that the evidence preponderates against the trial court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This Court may not re-weigh or reevaluate the evidence or substitute its inferences

for those drawn by the trial court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); Burns, 6 S.W.3d at 461. As such, the trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, a trial court's conclusions of law are reviewed under a purely de novo standard, with *no* presumption of correctness. Id.

## ISSUES ON APPEAL

## I. Ineffective Assistance of Counsel

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984); see Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000).

The United States Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

18

Strickland, 466 U.S. at 687. The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Id. at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278 (quoting Strickland, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. Courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665 n. 38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case ." Id. at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then he or she must satisfy the prejudice prong of the Strickland test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. Nichols, 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). Moreover, when challenging a death sentence, a petitioner must show "'a reasonable probability that, absent the errors, the sentencer . . .

19

would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695). Finally, if either element of the claim has not been established, the reviewing court need not address the other element. Strickland, 466 U.S. at 697.

## A.   *Pretrial*

### i. Statements to the Police

#### a. Prior to arrest

The Appellant contends that trial counsel failed to effectively prepare this case for trial. As a result, the Appellant argues that certain evidence was unlawfully admitted and favorable evidence was not introduced. Initially, the Appellant contends that trial counsel failed to seek suppression of statements the Appellant made to the police over the telephone prior to his arrest in Missouri. The jury heard the recording of the telephone call between the investigating detective and the Appellant. During that conversation, the Appellant said that the Texas prison system treated people like animals and warped his sense of reality. The Appellant told the detective he was "lost;" all he wanted to do was travel and kill. He threatened to blow up an entire city block in Texas. The Appellant also said that if he returned to Nashville he would either be found guilty and spend the rest of his life in prison or be executed.

The Appellant urges this Court to conclude that the probative value of those statements was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. As such, the Appellant argues that trial counsel should be deemed ineffective for failing to seek suppression of the statements. However, trial counsel testified during the post-conviction hearing that he did not believe those statements were too problematic. The Appellant testified during the guilt phase of the trial, and his testimony summarized the concerns he expressed over the telephone to the investigating detective. Moreover, appellate counsel acknowledged during oral argument before this Court in the instant appeal that there was no real factual dispute in this case. Indeed, trial counsel focused their defense on achieving a conviction for an offense lesser than first degree murder.

The physical evidence against the Appellant was overwhelming. Given that evidence, in addition to the fact the Appellant's trial testimony was similar in nature to the statements at issue, the Court concludes the Appellant has failed to demonstrate prejudice. The Appellant argues simply that trial counsel should have sought suppression of the statements. However, he does not argue how their suppression would have changed the outcome of the trial. The Appellant is not entitled to relief on this ground.

### b. Custodial Interview

Similarly, the Appellant contends that trial counsel failed to seek suppression of the remainder of the Appellant's custodial statement after the Appellant allegedly invoked his right to remain silent. The jury heard the Appellant's custodial interview with the police. The police began videotaping the interview; however, the video equipment failed over halfway through the interview. After a brief pause in the recording, due to the video equipment malfunction, the remainder of the interview was captured on audiotape. Once the recording resumed, the interviewing detective questioned the Appellant about statements he made during the lull in the recording. The following exchanged ensued:

> Detective: . . .We were in the process of talking with Mr. Leach, who we were doing an interview with Mr. Leach, while we were talking to him. And something happened to the video machine that quit playing. And it can't be fixed. There's not another battery for it. It can't be repaired. So we're going to conclude, basically, on this cassette tape, the interview.
>
> I just want to clarify a couple of things, Bobby, if you don't mind. When the tape – you remember when Don Wendell, the Sergeant that was in here doing the tape recorder. Something was going on. And you saw him fooling with the tape. It stopped or something. And we asked him – and he said, hold on a minute. And then he had to stop the tape. When we stopped the tape, have we mistreated you in any way?
>
> Appellant: No, sir.
>
> Detective: Have we done anything? When we stopped the tape, you made a statement to me.
>
> Appellant: Yes, sir.
>
> Detective: And I want you, if you want to continue with that statement, I want you to go ahead and make that statement now.
>
> Appellant: Can you refresh –
>
> Detective: Well, you, basically, said you — you wanted to conclude the interview.
>
> Appellant: I just – because my lawyer told me not to talk.

21

Detective: Okay.

Appellant: And I mean – and I talked. And I can't tell him that neither, nothing, you know, more than I ain't told you, you know what I'm saying?

Detective: I want to get – I still want to get clear, too, without talking about any other crimes or anything that's happened, when we initially talked to you, we weren't recording the interview. Do you remember when we first come [sic] in and we were basically talking about your life and things of that nature? And I read you a piece of paper that had your rights on it. And I also read the waiver of your rights. And at that point in time, you agreed that you would talk to us under the understanding that you didn't have to, and that we weren't making you do it, and that you could stop at any time, and that's what we're doing now. We're basically ceasing the interview. We're not going to ask you any more questions about this crime. If there's anything else you want to tell us, we'll – we'll be happy to listen to you. If you want us to ask you any more questions, we'll be happy to do that. But it's – it's totally in your ballpark now as to what you want to do.

Appellant: All I ask is that – is that is this going to the prosecuting attorney?

Detective: Yes, this is the same – this will be a continuation of the videotape. We just won't –

Appellant: All I ask is if you're going to give me time, major time, this is killing me. I really can't. I had just refer [sic] that you take a gun and shoot me instead of me trying to escape, but if you all want to help me, and I mean really bogged down, if my country really wants to help me, then I'll work with you and bog down and turn my life around, which I've been doing for the last three years. And if at all possible, if I can make my music work to help others, that's – that's all I want to do.

Detective: Do you – you realize, too, that – that we need more than we've got now? We – we want to help you in any way we can help you, but you've also got to help yourself.

Appellant: Right.

Detective: And –

Appellant:  And –

Detective:  And I'm trying to stay away from asking you questions about the crime, because I'm bound by law not to ask you, and I'm not gonna ask you. You can only, at this point, be the person to initiate anything else as far as –

Appellant:  Like I say, I blacked out.  I've had that problem for quite a while. Even my sister says I even do it sober.  I mean, I don't never hardly ever drink. She says sometimes she tells me things, and I don't remember it.  I don't know if it's because of my metal plate or what, but I know I'm not cruel, I'm not violent.  I don't go beat up people unless they're beating up on me.  And if I hurt anybody, it's because they hurt me.  That's – and if you'll talk to people, which it's not going to matter, but, if you go up here and talk to people around here, in Greenville, or in Columbia, they'll tell you that at any time I ever hurt anybody is only in self-defense or if they were hurting somebody else.  And that's the only way I'll hurt anyone.

The Appellant contends that he invoked his right to remain silent during this conversation.  According to the Appellant, all of the interview recorded on the audiotape after the videotape malfunctioned should have been suppressed.  The Appellant argues, therefore, that counsel was deficient for not filing the appropriate motion.  During the post-conviction hearing, trial counsel testified, based upon his conversation with the Appellant, that the above interaction between the Appellant and the detective was insufficient to warrant a motion to suppress.  Counsel stated:  "And we talked to him about it, his responses were such that about – about what he had said and why he went on talking that we didn't – we didn't believe we would be able to move forward with a motion to suppress."

The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself [.]"  Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."  Miranda v. Arizona bars the admission of any statements elicited from a defendant through police initiated custodial interrogation unless the defendant, prior to making the statement, was warned of certain constitutional rights and knowingly waived those rights.  384 U.S. 436, 444 (1966).  These procedural safeguards require police officers to advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation.  State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005).  If these warnings are not given, statements elicited from the individual may not be admitted into evidence.  Id.

23

Moreover, if the suspect indicates in any manner during the interview that he or she wishes to remain silent, the interrogation must cease. State v. Huskey, 177 S.W.3d 868, 878 (Tenn. Crim. App. 2005). After a suspect invokes his or her right to remain silent, police may not resume custodial interrogation unless the defendant's right to "cut off questioning" was "scrupulously honored." Id. If a police officer fails "'to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind,' a constitutional violation would occur." Id. at 879 (quoting Michigan v. Mosley, 423 U.S. 96 (1975)).

Our review of the trial record reveals that the Appellant did not explicitly tell the interviewing detective he wanted to discontinue the interview. The Appellant suggests, however, the record clearly *implies* he invoked his right to remain silent. According to the Appellant, the fact that the detective acknowledged that the law forbade him from asking the Appellant any further questions supports this implication. However, in order to prevail on a post-conviction claim, the Appellant must prove by clear and convincing evidence the facts in support of his claim. We agree with the post-conviction court that the Appellant did not meet his burden of proof with respect to this particular ground for relief. Trial counsel was aware of the substance and context of the interview. He questioned the Appellant about the matter. However, according to counsel, the dialogue between the detective and the Appellant after the recording resumed did not warrant the filing of a motion to suppress. And although the Appellant testified during the post-conviction hearing, he was not questioned about his alleged desire to discontinue the interview at issue. The Appellant had the opportunity to testify that he did, in fact, tell the interviewing detective he wished to cease talking, and further, that he did, in fact, inform trial counsel he did not want to continue talking after the break in the recording. The Appellant simply did not present sufficient proof to support his claim that trial counsel should have filed a motion to suppress his statement.

Even so, the Appellant would not likely have succeeded on a motion to suppress his statement. Once recording resumed, the officer attempted to clarify whether the Appellant actually requested to remain silent. The Appellant did not answer in the affirmative, and it is clear from the transcript of the interview the officer did not persist in repeated efforts to wear down the Appellant's resistance in order to make him change his mind. The officer simply attempted to ascertain the Appellant's position. The Appellant continued talking, but he did not say he wished to discontinue the interview. Huskey teaches us that we must look at the "totality of the circumstances" to determine whether the police "scrupulously honored" a suspect's right to "cut off questioning." 177 S.W.3d at 880. Reinterrogation does not constitute a per say violation of Miranda. Id. When viewed under a totality of the circumstances analysis, the continuation of the interview in this case did not offend the Appellant's constitutional rights.

Nevertheless, the Appellant has otherwise failed to demonstrate prejudice. The Appellant makes a blanket argument that the statements he gave to the detective after his alleged invocation of the right to remain silent affected not only the outcome of the guilt phase of the trial but also influenced the jury during sentencing. However, as trial counsel testified during cross-examination, the custodial statement which the jury heard was consistent with the Appellant's trial testimony. Moreover, the Appellant has not shown how his brief remarks – that he would rather be shot than try to escape or that he would not hurt someone except in self-defense – affected the outcome at the sentencing hearing in light of the strong evidence supporting the multiple aggravating factors found by the jury.

### c. Competency to Waive **Miranda** Rights

The Appellant next contends that trial counsel failed to adequately investigate the Appellant's competency to waive his Miranda rights. In support of his argument on appeal, the Appellant merely relies upon Dr. Caruso's diagnosis of narcissistic personality disorder. He also asserts his will to remain silent was overborne by the interrogating detective's insistence of wanting to help him.

As trial counsel testified, the Appellant was evaluated by various mental health experts prior to trial. Counsel's focus was finding some sort of diminished capacity defense to negate the mens rea for first degree murder. However, according to counsel, none of the experts' opinions benefitted the defense. Moreover, as noted above, trial counsel was aware of the circumstances surrounding the Appellant's custodial statement. The record reflects counsel simply did not possess any evidence suggesting the Appellant was incompetent to waive his Miranda rights. The post-conviction court concluded the Appellant did not point to any specific facts to support his claim that competency was an issue at the time he waived his Miranda rights. We agree. The Appellant offered no proof on the matter during the hearing below. This Court must conclude, therefore, that the Appellant failed to demonstrate how trial counsel was ineffective for not challenging the Appellant's ability to competently waive his Miranda rights.

### ii. Trial Preparation

The Appellant makes a general claim that trial counsel did not effectively prepare him for his trial testimony. The Appellant argues that counsel did not inform him how to explain to the jury some of the comments he made to the detective over the telephone prior to his arrest. The Appellant offered no proof, however, in support of his claim. Trial counsel testified that the defense did, in fact, prepare the Appellant for trial. Moreover, the Appellant testified at the post-conviction hearing that he wanted to testify at trial in order to convey to the jury the extent of the abuses he experienced in the Texas prison system. He also testified

25

that he wanted defense counsel to focus their attention on those abuses rather than his troubled childhood. However, despite his argument on appeal, the Appellant did not demonstrate during the hearing how trial counsel was deficient in preparing the Appellant for his testimony. He is not entitled to relief on this claim.

### iii. Investigation of Possible Defenses

The Appellant argues that trial counsel failed to reasonably pursue all possible defenses prior to trial. Specifically, he claims that counsel failed to adequately analyze Dr. Caruso's mental health evaluation and should have further investigated the psychological theory about the correlation between low serotonin levels and impulse control. As to Dr. Caruso's report, the Appellant relies upon Dr. Walker's testimony during the post-conviction hearing explaining how the Appellant's expression of remorse was uncharacteristic of the antisocial personality disorder. Both of these pursuits, according to the Appellant, would have helped negate the mens rea proof.

Prior to trial, the Appellant was evaluated by several mental health experts. Counsel obviously was aware of the results of each evaluation. Given the overwhelming evidence of guilt in this case, counsel testified repeatedly at the post-conviction hearing that the defense team hoped they could put forth a diminished capacity type of defense to negate the mens rea for premeditated first degree murder. However, as counsel further testified, he was disappointed with the results of the mental evaluations. Based upon his experience as a defense trial attorney, he did not believe it was in the Appellant's best interest to present to the jury evidence suggesting that he suffered from a narcissistic or anti-social personality disorder. Although the Appellant argues in the instant appeal that a person suffering from one of those disorders does not necessarily exhibit all of the traits associated with the disorder, such as lack of remorse, trial counsel did not want the jury to learn that being untruthful is one of the primary traits of the disorders, especially when the Appellant planned to testify on his own behalf. Moreover, trial counsel testified that he became increasingly uncomfortable with the reliability of Dr. Rossby's conclusions about the significance of the serotonin levels.

Given the strong presumption this Court must recognize, the Appellant has failed to demonstrate how counsel's conduct with respect to this particular claim fell below the range of reasonable professional assistance. Counsel explained the reasons for his decisions. His explanation is based upon adequate preparation and extensive trial experience. This Court cannot second-guess counsel's sound trial strategy. The Appellant has not satisfied his burden in this instance.

The Appellant also argues that trial counsel failed to interview the State's witnesses or retain experts who could have assisted in challenging the forensic evidence introduced at trial. Similarly, the Appellant argues that trial counsel failed to file the appropriate pretrial motions to suppress the DNA evidence collected from the Appellant after his arrest. The Appellant, however, failed to present any proof in support of this argument during the post-conviction hearing. If the claim is based on a failure to properly investigate, then the evidence or witness must be produced so the post-conviction court can properly evaluate the evidence or witness. See Black v. State, 794 S.W.2d 752 (Tenn. Crim. App. 1990). He is not entitled to relief in this instance.

### iv. Change of Venue

Finally, the Appellant complains about trial counsel's proffered reasons for not seeking a change of venue. Counsel said that he was aware there might be a need for a change of venue in this case. Counsel testified that he continued to monitor the pretrial publicity but ultimately observed nothing warranting a change of venue. Additionally, based upon his experience as a trial attorney, he stated that he preferred the jury pool in Davidson County due to its general ability to render verdicts based on intelligence rather than emotions. The Appellant again has failed to carry his burden on this claim. Trial counsel offered an informed and reasoned explanation as to why he did not move for a change of venue. His tactical decision withstands mere argument to the contrary by the Appellant. This Court cannot conclude counsel's sound trial strategy in this respect fell outside the acceptable range of professional conduct.

## B. *Trial*

### i. Cross-Examination of Witnesses

Citing United States v. Cronic, 466 U.S. 648 (1984), the Appellant asserts that his trial attorneys failed to "entirely . . . subject the prosecution's case to meaningful adversarial testing" such that prejudice is presumed in this case. In support of this assertion, the Appellant argues that trial counsel neglected to cross-examine over half of the State's witnesses, and failed to challenge many others, which resulted in repeated missed opportunities to call into question the Appellant's culpability. In his brief on appeal, the Appellant cites many instances in the trial transcript where he believes trial counsel should have questioned or challenged the prosecution's witnesses. However, despite these references to the trial record, the Appellant offered no proof during the post-conviction hearing regarding any of trial counsel's alleged deficiencies about which he now complains. The post-conviction court similarly observed that the Appellant presented no supporting factual basis and elicited no testimony at the hearing to support his contention that cross-

27

examination was necessary as to any of the witnesses in question. Again, the Appellant retains the burden of proving by clear and convincing evidence the factual allegations supporting the grounds for relief he claims in his petition for post-conviction relief.

Trial counsel did, in fact, cross-examine many of the prosecution's witnesses. However, counsel testified that he did not cross-examine other witnesses unless he thought he could change the tenor of the proof. To the extent that the Appellant now disputes counsel's decisions not to cross-examine or otherwise challenge the forensic and physical evidence introduced at trial, the Appellant did not present any proof at the post-conviction hearing which could have called into question trial counsel's conduct regarding the handling of witnesses. Contrary to the Appellant's assertion, this is not a case where defense counsel *entirely* failed to subject the prosecution's case to meaningful adversarial testing. In Cronic, the Supreme Court recognized "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversarial process itself presumptively unreliable." 466 U. S. at 659. However, as the State notices, the Supreme Court subsequently clarified its reasoning in Cronic:

> When we spoke in Cronic of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said "if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing." (citation omitted). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that counsel failed to do so at specific points. For purposes of distinguishing the rule of Strickland and Cronic, this difference is not of degree but of kind.

Bell v. Cone, 535 U.S. 685, 696-97 (2002).

To reiterate, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). The Appellant fails to demonstrate how counsel's conduct so undermined the adversarial process in this case. We cannot agree with the Appellant's argument that prejudice must be presumed in this case. The goal of the defense was to obtain a verdict less than first degree murder. To that end, and as recounted elsewhere in this opinion, trial counsel thoroughly investigated the facts of this case and had the Appellant evaluated by several experts in hopes of developing a diminished capacity defense. As trial counsel testified during the hearing, there was no dispute about the facts of the case. Indeed, there is no dispute the defense faced an uphill battle at the guilt phase of the trial. The Appellant even admitted as much during oral argument in the instant appeal. Without the

benefit of any favorable expert witness, trial counsel concluded, after much preparation, that the best approach to achieve their goal was to allow the Appellant to testify on his own behalf and hopefully "humanize" himself in the eyes of the jury.

Again, the Appellant proffered no proof during the post-conviction hearing to counter counsel's decisions regarding cross-examination. To claim now that his trial counsel *entirely* abandoned his defense ignores the evidence to the contrary which is replete throughout the record. The Appellant has simply failed to show how counsel was deficient in the handling of the witnesses at trial, much less demonstrate any resulting prejudice.

### ii. Presentation of Defense

The Appellant's attorneys, both at trial and in this post-conviction proceeding, have acknowledged there was no real factual dispute regarding the circumstances surrounding the murders in this case. The defense theory was, therefore, to negate the premeditation factor and hope for a conviction of a lesser grade of homicide. The Appellant, however, contends that defense counsel did not effectively follow through with their plan. Specifically, he complains about counsel's decision to forego calling any mental health expert to testify during the guilt phase. According to the Appellant's argument, trial counsel could not effectively present a diminished capacity defense without the benefit of expert testimony.

Trial counsel testified about the five different mental health professionals the defense consulted prior to trial. The Appellant was evaluated by four of those experts. However, after reviewing their findings and conclusions, counsel decided against calling any of the experts as witnesses. The Appellant was diagnosed with anti-social personality disorder and narcissistic personality disorder. According to the proof introduced at the post-conviction hearing, the negative characteristics associated with anti-social personality disorder are repeated lying, reckless disregard for others, and a lack of remorse. Based upon his experience with these types of evaluations, trial counsel did not want the jury to learn about the traits associated with those disorders, especially when the Appellant intended to testify on his own behalf. Moreover, counsel testified that Dr. Caruso placed more emphasis on the Appellant's willful actions than on his impulsive nature. Counsel testified that he would not have been able to limit Dr. Caruso's testimony to specific positive points during direct or cross-examination. Counsel stated that Dr. Caruso would have "put more weight on the narcissistic personality disorder that he diagnosed and described this all as effort to the event, the incident, as an effort to gain notoriety on Mr. Leach's part" and would have "describe[d] Mr. Leach's conduct as more self-willed or willful than – than we wanted it to be." According to counsel, that emphasis would have thwarted their attempt to show the jury the Appellant did not act with premeditation.

As for Dr. Rossby and his reports on the Appellant's serotonin levels, trial counsel testified that he became increasingly uncomfortable with Dr. Rossby's reliability. Counsel testified about a void in Dr. Rossby's resume which he was either unwilling or unable to explain. Furthermore, counsel asked Dr. Rossby to provide him with more information about the data on which he was relying. According to counsel, after a pretrial hearing in which the State sought to bar Dr. Rossby's testimony, counsel exchanged emails and faxes with Dr. Rossby over the course of several days. However, after reviewing Dr. Rossby's explanations, counsel did not think the jury would believe his testimony. Counsel said he did not want to have to defend Dr. Rossby's science in the middle of trial: "We had enough to try and defend without having to defend an expert who – who, potentially, wasn't doing a good enough job explaining why he thought this was important in [the Appellant's] defense."

The post-conviction court concluded: "counsel diligently approached the facts before him, pursued mental health as a possible defense to the offenses and evaluated the results of the retained experts." The court found trial counsel's decisions to be reasonable and well-informed. The court held, therefore, it would not second guess counsel's tactical decision in a hindsight review. This Court must agree with the post-conviction court. We are reminded of our duty when reviewing ineffective assistance of counsel claims. In evaluating a lawyer's performance, the reviewing court uses an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 688 (1984); State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999). The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see Strickland, 466 U.S. at 689. The courts should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State , 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

Trial counsel made an informed and reasonable strategic decision not to call any of the retained expert witnesses. Although counsel had the Appellant evaluated by four different mental health experts, he was not pleased with the results. Counsel concluded that the expert testimony would do more harm than good in terms of showing the jury that the Appellant acted without premeditation. As the State observes on appeal, the record reveals trial counsel spent a significant amount of time and resources developing the mental health expert aspect of the diminished capacity defense. Unfortunately for the Appellant, his defense was unsuccessful. Again, a post-conviction petitioner is not entitled to the benefit of hindsight nor may he criticize a sound, but unsuccessful, tactical decision. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The Appellant has failed to prove counsel's deficiency in this respect.

### ii. Corroboration of Appellant's Trial Testimony

The Appellant argues that trial counsel failed to introduce any documents or reports to support statements he made during his trial testimony. Specifically, the Appellant asserts that trial counsel should have introduced into evidence certain prison records detailing the abuses he suffered. The post-conviction court concluded, however, that the Appellant failed to demonstrate how the documents would have been admissible under the rules of evidence during the guilt phase of the trial. Indeed, the Appellant neglects to explain how counsel could have overcome the hearsay hurdle regarding the admissibility of any of the documents to which he refers. Nevertheless, the post-conviction court further concluded that counsel's failure to introduce the documents in question did not prejudice the outcome of the trial. We agree.

The Appellant told the jury about the abuses he suffered. Trial counsel testified that he wanted the Appellant to "humanize" himself by telling his own story to the jury. Moreover, as the Appellant reiterated during the post-conviction hearing, he wanted to tell the jury about the abuses he suffered in the Texas prison system. The documents at issue would have been cumulative to the Appellant's own testimony. See Nichols v. State, 90 S.W.3d 576 (Tenn. 2002) (counsel not faulted for failing to introduce cumulative evidence). The Appellant does not claim that the information referenced in the documents at issue was unknown to the jury. He argues instead that the documents would have substantiated his testimony. However, the Appellant ignores the fact he actually informed the post-conviction court that part of his trial testimony – having been gang raped in prison – was a lie. The Appellant has simply failed to prove how counsel's conduct in this respect was deficient or prejudicial.

### iv. Prosecutorial Misconduct

In his amended petition, the Appellant stated that "[t]rial counsel failed to object to prosecutorial misconduct during the petitioner's trial testimony and in the State's closing argument, including but not limited to, comments regarding the defendant's failure to present certain evidence, the prosecutor's denigration of defense counsel, and the prosecutor's rebuttal argument which strayed far outside the scope of the defense closing argument." The Appellant, however, did not cite to any specific portion of the prosecutor's closing argument aside from this general statement. Nor did the Appellant question trial counsel during the hearing about why objections were not raised. Finally, the Appellant did not address the issue in his post-hearing brief filed with the post-conviction court.

The post-conviction court considered this particular claim waived: "The Court is not provided with specific remarks made by the prosecutor nor is the Court directed to a specific

portion of the record. Failure to factually substantiate this bald assertion of prosecutorial misconduct prevents the Court from fully evaluating this ground for relief . . . Without specific references to the record or citation to authority, the Court finds no basis for relief." The Appellant only now, for the first time in his brief on appeal, cites to specific portions of the prosecutor's argument to which he claims trial counsel should have objected.

Generally, claims for relief presented for the first time on appeal are considered waived. See Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994) ("[A] party will not be permitted to assert an issue for the first time in the appellate court."). Similarly, because ineffective assistance of counsel is considered a single ground for relief under the post-conviction statute, see Cone v. State, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995), a petitioner may not for the first time on appeal present new and different factual allegations in support thereof. See Erika Louise Bunkley Patrick v. State, No. W2004-02217-CCA-R3-PC, 2006 WL 211824, at * 10 (Tenn. Crim. App., Jan. 24, 2006) (citing Thompson v. State, 958 S.W.2d 156, 161 Tenn. Crim. App. 1997). Because the Appellant did not give the post-conviction court the opportunity to address this claim, it must be considered waived.

Nevertheless, despite waiver, the Appellant has not demonstrated prejudice; that is, he has not shown that counsel's alleged deficiency by failing to object to certain parts of the prosecutor's argument was of such a degree it deprived the defendant of a fair trial and called into question the reliability of the outcome. State v. Nichols, 90 S.W.3d 576, 587 (Tenn. 2002). The jury was clearly instructed that the State maintained the burden of proving each element of the offenses beyond a reasonable doubt. The jury was further instructed that the statements of counsel were not to be considered as evidence. More importantly, trial counsel was not given the opportunity to explain his actions. The Appellant must prove facts in support of each claim by clear and convincing evidence. The Appellant states that the argument affected the jury's verdict, but he does not explain how. The Appellant merely cites to those parts of the prosecutor's remarks he finds objectionable without any supporting argument. We conclude, therefore, that the Appellant is not entitled to relief on this claim.

### v. Closing Argument

Defense counsel encouraged the jury during closing argument to find the Appellant guilty of second degree murder instead of first degree murder. The Appellant argues this concession is a constructive denial of the assistance of counsel which requires no proof of prejudice. This Court does not agree. As noted previously, there was no doubt about the physical evidence in this case. The strategy of defense counsel from the beginning was to obtain a conviction for an offense less than first degree murder. Trial counsel's closing

argument was in line with that strategy. As such, the post-conviction court concluded that the Appellant failed to demonstrate any deficient performance:

> Lead counsel Alderman testified at the post-conviction hearing that the evidence of guilt was strong, citing DNA, fingerprints, palm prints and more. Even though he always had acquittal in his hopes, he said his goal was to convince the jury the killings were not premeditated and in so doing dispense with the need for a penalty phase. Mr. Alderman instituted that tactic during closing argument when he tried to convince the jury that the killings were at most second degree murder. Petitioner shows no evidence or facts to support a credible claim for acquittal.

> The trial transcript indicates trial counsel argued the defendant acted in a state of excitement or passion. In fact, he argued the defendant was unable to reflect or exercise the judgment required for premeditated murder. Counsel Alderman insisted to the jury that the very nature of these murders illustrates the lack of clear-headed judgment or reflection. Counsel in fact argued these were knowing killings but did so in an attempt to eliminate the premeditated murder count.

> The Court agrees that the convicting evidence was strong. Trial counsel's attempt to convince the jury the murders were not first degree was a reasonable tactic in light of the evidence. Absent some reasonable or credible explanation or alternative argument, neither of which were articulated by petitioner, the Court finds the tactic to have been a reasoned and informed one.

We must concur. Counsel began his closing argument by explaining to the jury the notion of premeditation. Counsel then suggested the horrific facts of this case could only lead the jury to conclude the killings took place in a state of passion without any sense of forethought. Counsel attempted to explain away the felony murder charge by reminding the jury that the Appellant did not approach the victims' home with any initial intent of robbing them. Counsel summarized the Appellant's tragic personal history and recalled the Appellant's testimony describing the abuses he experienced in prison and his fear of returning to Texas. Counsel admitted there was no excuse for the Appellant's actions. Instead, counsel argued to the jury that the Appellant "snapped" as a result of the stressors which had built up inside him.

An unsuccessful closing argument does not equate to ineffective assistance of counsel. Contrary to the Appellant's argument on appeal, trial counsel did not abandon the stated defense. When viewed in context of the facts of this case, counsel's closing argument,

though unsuccessful, thoughtfully presented the theory of the diminished capacity defense to the jury. The Appellant has simply failed to show how counsel's performance during closing fell below an objective standard of reasonableness.

### vi. Jury Instructions

The Appellant argues trial counsel should have requested instructions on the lesser included offenses of voluntary manslaughter and reckless homicide. The jury in this case was instructed on first degree murder (both theories) and second degree murder. The jury's verdict of first degree murder and its disinclination to consider second degree murder clearly demonstrated the jury would not have returned a verdict of the lesser offenses of manslaughter or reckless homicide. The Appellant, therefore, cannot show prejudice. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). As to the Appellant's complaint about trial counsel's failure to request an instruction on "T.P.I. – Crim. 42.22, Evidence of Mental State," we agree with the State that the Appellant has waived consideration of this issue by failing to first raise it in the post-conviction court.

## C. *Sentencing*

### i. Defense Strategy

The Appellant argues that trial counsel were ineffective in several ways during the penalty phase of this capital trial. The Appellant asserts that trial counsel did not develop or implement a coherent strategy for the presentation of mitigation. Similarly, the Appellant asserts that trial counsel failed to properly prepare for the sentencing hearing. However, the Appellant makes these bare assertions without any factual support or citation to the record. Trial counsel testified about their extensive pretrial investigation. Attorney Alderman remained lead counsel throughout the trial, and any information gathered during investigation was shared among the entire defense team. As the record reflects, numerous witnesses were called to testify on the Appellant's behalf during sentencing. Indeed, counsel stated those witnesses testified to the exact information the defense wanted to present to the jury. During the post-conviction hearing, the Appellant did not introduce any significant substantive information which was not previously known to trial counsel.

The Appellant does not explain specifically how counsel was ineffective in this respect. He simply argues: "[N]o theme or theory was developed for the sentencing hearing in this case. Defense counsel failed to work together to develop an overall strategy for the sentencing hearing. The defense team failed to review together all of the available evidence and make decisions regarding what to present and what not to present." However, the testimony at the post-conviction hearing discredits these blanket statements. The post-

34

conviction court concluded that the Appellant failed to provide any factual basis to support his claim:

> [P]etitioner claims trial counsel failed to develop and/or implement a strategy for the sentencing hearing. Again, petitioner provides no specific factual basis to support this claim.
>
> Lead counsel, Ross Alderman, testified that he remained in that position from the pretrial phase throughout the penalty phase. He recalled that Amy Harwell was assigned to work on the mitigation aspect of the trial and that Maryann Hea was an in-house mitigation specialist.
>
> Mr. Alderman said the team decided who should testify at the penalty phase. He believed those witnesses called corroborated the defendant's own testimony during the guilt phase. While other witnesses could have testified at the penalty phase, Mr. Alderman chose not to present their testimony, characterizing it as cumulative.
>
> Because no other factual allegations accompany this ground for relief, the Court cannot surmise precisely how trial counsel failed to develop a strategy. Similarly, the Court cannot look behind this general allegation in an attempt to ascertain what type of strategy should have been adopted by counsel and how [the] petitioner was prejudiced by failing to do so. As noted, counsel testified that he believed the witnesses presented corroborated the defendant's testimony. The Court finds counsel's responses to be reasonable under the circumstances of this case.
>
> [Similarly], petitioner maintains trial counsel failed to adequately prepare for the sentencing hearing. No factual allegations are cited in support of this claim for relief. The testimony at the post-conviction hearing indicate[s] lead counsel Alderman met with his team on a regular basis. Further, the testimony from Ms. Hea and Mr. Alderman indicate when mitigation or other relevant proof was gathered by the defense team, such materials were shown either to Mr. Alderman or to the team as a whole.
>
> Again, Ms. Harwell criticized her own performance as a member of the defense team and in hindsight found numerous flaws in her assistance at the sentencing phase. However, nothing in the testimony supports a claim that the team or any member . . . inadequately prepared for the sentencing hearing.

35

We must agree with the post-conviction court. The Appellant simply failed to meet his burden of proof. Furthermore, his argument on appeal, without any factual support or citation to the record, does not establish how trial counsel's performance fell below an objective standard of reasonableness. The record reflects that counsel was well prepared. They simply faced an uphill battle during both phases of the trial. The Appellant is not entitled to relief on this claim.

### ii. Opening Statement

The Appellant advances on appeal another general argument regarding trial counsel's performance during sentencing. In this respect, he argues that trial counsel "failed to articulate to the jury in the opening statement of the sentencing hearing why the Petitioner deserved a sentence less than death." The Appellant cites to the entire opening statement in the trial transcript, however, he neglects to point to any specific language which should or should not have been employed. The post-conviction court concluded:

> While it is simple to make a blanket assertion that trial counsel was not effective in [her] opening argument, it is more difficult to explain what counsel should have argued. Such second guessing or hindsight reflection in light of the resulting verdict now known to all is simply not the standard by which trial counsel is evaluated in an ineffective assistance of counsel claim. Nothing in counsel's opening argument at the penalty phase leads this Court to conclude that [she] failed to articulate why [her] client deserved less than death. This basis has not been proven by clear and convincing evidence and otherwise is without merit.

This Court agrees with the post-conviction court. In her opening, Attorney Harwell summarized the testimony of the witnesses the defense intended to call. She explained to the jury how the Appellant never had a chance to develop the appropriate discipline or self-image because of the abuses he suffered. Counsel stated: "[Y]ou need to know how he became a fundamentally broken man. That you understand how he got here is important." Counsel reminded the jury that they would determine the Appellant's fate, and asked them to consider all of the information about his life before making their decision. Counsel stated: "You are also deciding the fate of a human being he was the day before the crime and the person he was the day before that and the person he was the year before that and the child he was when this all began."

The Appellant has failed to show how counsel's performance was deficient. Trial counsel was not specifically questioned during the post-conviction hearing about the substance of her opening statement. Moreover, the Appellant does not suggest any

alternative approach. Nevertheless, this Court has reviewed the entire opening statement and concludes the same to have been reasonable given the facts and circumstances of the case.

### iii. Presentation of Evidence

Next, the Appellant contends that trial counsel failed to present all available mitigating evidence during the sentencing hearing. The Appellant recounts the post-conviction testimony of Ms. Hea and Attorney Harwell regarding the extent of their pretrial investigation. The Appellant also refers to specific documents detailing events from the Appellant's background which were gathered during pretrial investigation but not shown to the jury. As part of his argument, the Appellant complains that Ms. Hea was not called as a witness to testify about her findings. The Appellant also argues that defense counsel should have introduced as exhibits during sentencing those documents obtained during the investigation. At the post-conviction hearing, Attorney Harwell was asked to review those documents. After reviewing each one, Attorney Harwell testified that, in her opinion, all of the documents should have been shown to the jury during sentencing.

When considering a claim that trial counsel failed to present sufficient mitigating evidence, our supreme court has directed the courts to consider the following: (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad v. State, 938 S.W.2d 363, 371 (Tenn. 1996). In denying relief on this particular claim, the post-conviction court concluded:

> Due to the nature of the mitigation witnesses presented at the penalty phase, Ms. Hea's testimony would have provided little insight into the petitioner's life separate and apart from the testimony of the respective witnesses. Mr. Alderman wanted to present witnesses who could corroborate the petitioner's testimony. The defense presented the testimony of Jane Henson (petitioner's aunt who testified about his childhood), Judy Waltz (petitioner's aunt who testified about his childhood and his parent's alcoholism), Ann LaPoint (counselor at Central County Center for Mental Health and Retardation in Temple, Texas), Richard Bennett (childhood friend of petitioner), Carol Duma (petitioner's kindergarten teacher), Reverend Harry Duma (prior employer of petitioner), and Cathy Watson (petitioner's sister who testified about suicide attempts, prison rape, and more).

The chosen strategy would not likely have benefitted from the testimony of Maryann Hea. Nonetheless, the petitioner must show the Court that failure to call Ms. Hea constituted ineffective assistance of counsel. In light of the testimony presented here, he has failed to meet his burden.

Petitioner also claims counsel was ineffective for failing to introduce various documents (presented as exhibits to the post-conviction hearing). These documents relate to, among other things, the defendant's family history, criminal history, and various perceived accomplishments. Applying the standards set out above [from Goad], this evidence was substantially presented via the petitioner's testimony at trial and the presentation of the selected mitigation witnesses at the penalty phase. The defendant testified at length at trial about family neglect and abuse as well as prison system abuse. He spoke of his bad childhood, his parent's divorce and their alcoholism, his embarrassing bowel problem, and other behavioral issues. While more specifics could always be presented in any given penalty phase, counsel is not required to present all available mitigation evidence.

Given the strength of the aggravating circumstances, the failure to present the additional mitigating evidence did not constitute ineffective assistance of counsel.

This Court agrees with the post-conviction court. The general theme of the information contained in the documents referred to by the Appellant was, in fact, relayed to the jury through the testimony of the defense witnesses, including the Appellant's own trial testimony. As Attorney Alderman suggested, cumulative evidence was avoided. Counsel testified during the post-conviction hearing that he did not recall why Ms. Hea was not called as a witness. However, he testified that all of the information the defense wanted the jury to learn during sentencing was presented through the testimony of the various witnesses. According to counsel, the defense strategy was to "humanize" the Appellant through his own testimony during the guilt phase and to then corroborate or reinforce his testimony through others during sentencing. To this end, the jury was instructed that it could consider as mitigation any evidence introduced in the guilt phase of the trial.

There is no requirement that defense counsel present any evidence in mitigation. Goad, 938 S.W.2d at 369-70. Nor is there a requirement that counsel present cumulative evidence. Nichols v. State, 90 S.W.3d 576, 601 (Tenn. 2002). However, this is not a case where trial counsel failed to present any evidence of mitigation. Instead, the Appellant here merely argues that trial counsel should have presented what can only be described as cumulative evidence. We are reminded of the deference which must be given to counsel's

informed decisions regarding the presentation of proof. And despite Attorney Harwell's admission about her ineffective representation, this Court must still conduct an independent analysis of trial counsel's performance under the Strickland standard. Based upon our review of the record, in light of the testimony elicited at the post-conviction hearing, we cannot conclude that trial counsel's presentation of its mitigation case was deficient or otherwise unreasonable.

Without discounting counsel's performance in this respect, we cannot otherwise conclude the Appellant has shown "there is a reasonable probability that, absent [any] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland v. Washington, 466 U.S. 668, 695 (1984). The strength of the aggravating circumstances in this case was overwhelming and there is no reasonable probability the introduction of the documentary evidence would have swayed the jury. The Appellant is not entitled to relief on this claim.

### iv. Closing Argument

The Appellant also asserts that trial counsel's decision to waive closing argument during sentencing represents a presumption of ineffectiveness thereby obviating the need to show prejudice. See United States v. Cronic, 466 U.S. 648 (1984). The State contends this argument must fail "as a matter of law."

We will first address the Appellant's reliance on Cronic. In another Tennessee post-conviction capital case, the petitioner, Gary Bradford Cone, alleged ineffective assistance of counsel, in part, because defense counsel did not present any mitigation proof and waived closing argument during the sentencing phase of his capital trial. Cone v. State, 747 S.W.2d 353 (Tenn. Crim. App. 1987). Counsel in Cone testified that he chose to waive closing argument to prevent the prosecutor, who was "capable of making very devastating closing arguments," from having the last word. Id. at 357. This Court concluded on appeal that trial counsel's decision was a legitimate trial tactic. Id. Finding the petitioner's allegation without merit, the Court went on to state:

> Trial counsel made a diligent and thorough investigation of the facts and the law. Although the appellant was without funds, trial counsel was able to procure a defense team composed of himself, a research expert, medical experts, and an investigator. No stone was left unturned in the preparation of the appellant's defense. Trial counsel was very conscientious in representing the appellant and placed much thought and effort into the tactical aspects of this case. However, trial counsel's work and diligence could not remove the overwhelming evidence against the appellant, both on the factual issue and

insanity issue. In our view, the findings of guilt and the imposition of the death penalty were based upon the facts and the law – not by shortcomings of counsel.

Id. at 357-58.

In the appeal of his federal habeas corpus petition, Cone argued that the United States Supreme Court's reasoning in Cronic – that prejudice may be presumed – should have applied in his case because trial counsel failed to subject the prosecution's case to meaningful adversarial testing. Bell v. Cone, 535 U.S. 685, 696 (2002). The Supreme Court disagreed: "The aspects of counsel's performance challenged by [Cone] – the failure to adduce mitigating evidence and the waiver of closing argument – are plainly of the same ilk as other specific attorney errors we have held subject to Strickland's performance and prejudice components." Id. at 697.

Given this precedent, we must agree with the State. Prejudice will not be presumed in this case just because trial counsel waived closing argument. The Court must examine the Appellant's claim in this respect under the Strickland standard.

The post-conviction court concluded that trial counsel, by waiving closing argument, did not render ineffective assistance. The court held:

Ross Alderman testified at trial that he recalls making the decision not to present a closing argument. He described it as one of the most difficult decisions in his career. In fact, he added that it was so difficult he recalled his feelings immediately after making the announcement. When questioned about his decision to waive closing argument, Mr. Alderman said it was common knowledge in the Nashville legal community and more specifically at the courthouse that Deputy District Attorney Tom Thurman had begun to utilize PowerPoint presentations during the final closing of a capital case penalty phase. Mr. Alderman testified that these presentations included powerful emotional images of the victims of the offense.

Mr. Alderman believed he could foreclose such a powerful presentation with the element of surprise. He knew that if he waived closing argument, he would cutoff Mr. Thurman's presentation. After hearing the initial closing statement of the State, Mr. Alderman thought it would be a good tactical decision to waive his closing remarks. Counsel admitted that in hindsight he did not know if he would make the same decision but felt it was the right decision at the time.

40

Having heard the reasoning of counsel, the [c]ourt concludes that the decision to waive closing argument was a tactical one and therefore did not constitute ineffective assistance of counsel. The decision was not made lightly and was made with a stated purpose in mind. Competent trial counsel believed the ability to eliminate Mr. Thurman's emotional PowerPoint presentation would benefit the defendant more than attempting to convince a jury that death was not the appropriate punishment for the defendant.

Counsel said the jury had heard from the defendant and had heard the mitigation witnesses. Mr. Alderman did not want the jury to be reminded of the horrific nature of these offenses. Petitioner argues counsel cannot hide behind a finding that the decision was tactical, arguing that even a tactical decision must be based on reasonable conduct and considerations. However, petitioner has failed to convince the [c]ourt that the tactical decision was not based in reason. The [c]ourt will not engage in 20/20 hindsight evaluations of counsel's decision.

The post-conviction court's discussion of this issue embodies the United States Supreme Court's mandate that reviewing courts "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Cone, 535 U.S. at 702. We must agree with the post-conviction court.

In his initial closing argument, the prosecutor in this case argued to the jury that the evidence the State presented clearly established the aggravating circumstances charged. He also briefly recounted some of the mitigation proof presented during both the guilt and penalty phases of the trial. However, the prosecutor further argued to the jury his belief that the aggravating evidence outweighed the mitigating evidence. The reasons Attorney Alderman proffered for waiving his closing argument are accurately summarized above by the post-conviction court. Counsel testified that his decision in this case was one of the most difficult of his career. He was well-prepared to present closing argument. However, based upon Attorney Thurman's reputation for employing graphic PowerPoint presentations displaying powerful emotional images of the victims during closing argument in capital cases, Attorney Alderman decided it was best not to leave the jury with those lasting images in their head before deliberating about his client's life.

Although the Appellant argues that counsel did not actually see the PowerPoint presentation to be used by the prosecutor in this case, the Appellant did not present proof to counter Attorney Alderman's testimony regarding Attorney Thurman's practice in this

41

regard. Based upon his knowledge of that practice, Attorney Alderman weighed the options of summarizing the evidence the defense had already presented or allowing the State to leave with the jury lasting images of the victims. Attorney Alderman's decision was both informed and reasoned, and it was a difficult but tactical decision based upon the circumstances of the case presented at the time. The post-conviction court observed: "Counsel admitted that in hindsight he did not know if he would make the same decision but felt it was the right decision at the time." "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (quoting Strickland, 466 U.S. at 689).

Although the facts and circumstances of each case are unique, we are reminded of the United States Supreme Court's statements in Cone:

> After respondent's counsel gave his opening statement discussing the mitigating evidence before them and urging that they choose life for his client, the prosecution did not put on any particularly dramatic or impressive testimony. The State's witnesses testified rather briefly about the undisputed facts that respondent had prior convictions and was evading arrest.
>
> When the junior prosecutor delivered a very matter-of-fact closing that did not dwell on any of the brutal aspects of the crime, counsel was faced with a choice. He could make a closing argument and reprise for the jury, perhaps in greater detail than his opening, the primary mitigating evidence concerning his client's drug dependency and posttraumatic stress from Vietnam. And he could plead again for life for his client and impress upon the jurors the importance of what he believed were less significant facts, such as the Bronze Star decoration or his client's expression of remorse. But he knew that if he took this opportunity, he would give the lead prosecutor, who all agreed was very persuasive, the chance to depict his client as a heartless killer just before the jurors began deliberation. Alternatively, counsel could prevent the lead prosecutor from arguing by waiving his own summation and relying on the jurors' familiarity with the case and his opening plea for life made just a few hours before. Neither option, it seems to us, so clearly outweighs the other that it was objectively unreasonable for the Tennessee Court of Appeals [sic] to deem counsel's choice to waive argument a tactical decision about which competent lawyers might disagree.

We cautioned in <u>Strickland</u> that a court must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight. 466 U.S., at 689, 104 S.Ct. 2052. Given the choices available to respondent's counsel and the reasons we have identified, we cannot say that the state court's application of <u>Strickland's</u> attorney-performance standard was objectively unreasonable.

535 U.S. at 701-02.

We conclude the Appellant has failed to demonstrate deficient performance on the part of trial counsel. Given our review of the record, and considering Attorney Alderman's explanation for not making a closing argument, we have determined that counsel's conduct fell within the wide range of reasonable professional assistance. <u>Strickland</u>, 466 U.S. at 689. Again, however, notwithstanding the Appellant's failure to meet his burden in this regard, he has not argued and has failed to otherwise show any resulting prejudice.

### v. Jury Instruction

Finally, the Appellant submits that trial counsel's failure to request an instruction on the (j)(8) mitigating circumstance constituted ineffective assistance. This particular statutory mitigating circumstance provides: "The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment." Tenn. Code Ann. § 39-13-204(j)(8). In this case, the trial court instructed the jury it "shall consider . . . any mitigating circumstances raised by the evidence, which shall include, but are not limited to the following:

(1) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
(2) The defendant's family history;
(3) The defendant's social history;
(4) The defendant's mental health;
(5) The environment in which the defendant was raised;
(6) Any physical, sexual, or emotional abuse suffered by the defendant;
(7) Any contribution the defendant could make to improve the life of others;
(8) Any attempts by the defendant to receive treatment for any mental or emotional impairment;

43

(9) Any residual or lingering doubts you may have about the defendant's participation in the commission of the offenses. Residual doubt means doubt somewhere between reasonable doubt, as defined herein, and absolute certainty of guilt;

(10) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant, which is supported by the evidence."

The Appellant offers no argument in support of his proposition that counsel's failure to request the (j)(8) statutory mitigating circumstance constituted ineffective assistance. The Appellant simply states in his brief: "Trial counsel failed to submit for the jury's consideration all statutory mitigating circumstances that existed in this case." He neglects to explain how counsel's conduct was deficient in this respect. The State argues, therefore, this issue should be considered waived. See Tenn. Ct. Crim. App. R. 10(b). We must agree with the State. The Appellant has waived this issue on appeal by failing to proffer any sort of argument in its favor. Id. Nevertheless, the Appellant has not demonstrated how counsel's failure to request the (j)(8) mitigating circumstance, in light of the ten other mitigating factors specifically instructed by the trial court, was deficient or otherwise resulted in prejudice.

Given our review of the record, we conclude the Appellant has failed to establish that he received the ineffective assistance of counsel during either the guilt or penalty phase of his trial. This ground for post-conviction relief is, therefore, without merit.

## II. Sentence for Especially Aggravated Robbery

Next, the Appellant claims that the trial court erred in enhancing his sentences for especially aggravated robbery and aggravated rape based on judicially determined facts. Citing State v. Gomez, 239 S.W.3d 733 (Tenn. 2007), the Appellant argues the sentences imposed for those convictions violate his constitutional rights. However, our review of the matter reveals the Appellant's claim is waived, as the State suggests, and is otherwise without merit.

In Cunningham v. California, 549 U.S. 270 (2007), the United States Supreme Court, relying upon the principles discussed in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004), reaffirmed the rule, "rooted in longstanding common-law practice," that the Sixth Amendment prohibits a state's sentencing scheme from allowing a judge to enhance a sentence based on a fact, other than a prior conviction, not

44

found by a jury or otherwise admitted by the defendant. We are aware of our supreme court's opinion in Gomez. Although the court concluded that the trial court's enhancement of the defendants' sentences on the basis of judicially determined facts violated their Sixth Amendment rights, the issue was considered through a plain error analysis on the direct appeal of the defendants' convictions. However, this Court has held that Blakely-type claims garner no relief retroactively through attacks on collateral review. See Donald Branch v. State, No. W2003-03042-CCA-R3-PC, 2004 WL 2996894 (Tenn. Crim. App., Dec. 21, 2004), perm. to app. denied, (Tenn., May 23, 2005). Similarly, the holding in Cunningham does not require retroactive application. See Billy Merle Meeks v. State, No. M2005-00626-CCA-R3-HC, 2007 WL 4116486 (Tenn. Crim. App., Nov. 13, 2007), perm. to app. denied, (Tenn., Apr. 7, 2008). Because the Appellant did not challenge his sentences on direct appeal, after both Apprendi and Blakely had been decided, this ground for post-conviction relief has been waived. See Tenn. Code Ann. § 40-20-106(g).

## III. Aggravating Circumstances

The Appellant also contends the trial court's jury instructions on the aggravating circumstances are unconstitutional because the jury was not required to make a unanimous finding about which of the elements of the aggravating circumstances they agreed upon. Again, however, as the State suggests, this ground has been waived because the Appellant failed to raise it on direct appeal. See Tenn. Code Ann. § 40-20-106(g). Regardless, his contention is otherwise without merit. See State v. Keen, 31 S.W.3d 196, 208-10 (Tenn. 2000).

## IV. Lethal Injection

The Appellant advances on appeal a one sentence challenge to Tennessee's method of execution: "The three-drug protocol currently used by the State of Tennessee as the procedure for implementing the lethal injection punishment violates the U.S. Constitution's Eight Amendment protection against cruel and unusual punishment." The Appellant offers no argument or authority in supports of his proposition. The issue is, therefore, waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate reference to the record will be treated as waived in this court.").

Nevertheless, the Appellant's challenge must otherwise fail. Our supreme court has considered this claim and has concluded Tennessee's lethal injection protocol is consistent with contemporary standards of decency and with the overwhelming majority of lethal injection protocols used by other states and the federal government. Abdur' Rahman v. Bredesen, 181 S.W.3d 292, 306-07 (Tenn. 2005), cert. denied. Moreover, the United States Supreme Court has affirmed the use of the three-drug protocol used in Kentucky's lethal

45

injection procedure. Baze v. Rees, 553 U.S. 35 (2008). Tennessee uses the same protocol as Kentucky. Id. (citing Workman v. Bredesen, 486 F.3d 896, 902 (6th Cir. 2007)); see Harbison v. Little, 571 F.3d 531 (6th Cir. 2009), cert. denied, --- U.S. --- (2010).

## V. Death Penalty Statute

The Appellant advances general constitutional attacks against the State's death penalty statute. The Appellant challenged the constitutionality of this same statute in his direct appeal. Our supreme court held that the Appellant's challenges had repeatedly been rejected. State v. Leach, 148 S.W.3d 42, 67 (Tenn. 2004). To the extent the Appellant renews any of those challenges herein, they must be considered previously determined under the terms of the post-conviction statute. See Tenn. Code Ann. § 40-30-106(h). Moreover, any challenge raised for the first time in the post-conviction context must be considered waived. See Tenn. Code Ann. § 40-30-106(g). The Appellant had the opportunity to present these challenges in his direct appeal but failed to do so. None of the authorities cited by the Appellant were decided after the conclusion of his direct appeal. The Appellant is not entitled to relief on this ground.

## VI. Trial Court Error

Finally, the Appellant argues the trial court improperly cut short his guilt phase testimony. However, because this claim for relief was not raised on direct appeal, the Appellant has waived consideration of the matter. See Tenn. Code Ann. § 40-30-106(g). Despite this waiver, the Appellant is not entitled to relief. The post-conviction court addressed the issue in its written order:

> The defendant/petitioner exercised his right to testify at trial. He spoke extensively of his life experiences including an abusive and neglectful childhood, alcoholism, and abuses in the prison system. . . . [T]he defendant's testimony was shortened essentially by his own will. When his testimony began to flow in and out of life experiences and his views on the world or other abstract thought, the Court merely attempted to bring the unguided narratives back to relevant testimony the jury could understand. Despite repeated attempts, the defendant insisted on this chaotic rant about relevant and irrelevant matters. While the Court granted him great leeway, the time came for the Court to return order to the courtroom.
>
> The Court finds no constitutional deprivation in its attempt to make the defendant's testimony a meaningful recitation of his life history of events leading up to the killings of two elderly ladies. Upon review of the trial and

46

in light of a similar unending and repetitive narrative shared at the post-conviction hearing, the Court finds its actions to have been proper under the circumstances.

"It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993). We disagree with the Appellant's contention that the trial judge's actions deprived him of a fair trial. Our review of the trial transcript leads us to the same conclusion reached by the post-conviction court. The judge in this case merely maintained some sense of order with regard to the Appellant's testimony. We find the supreme court's comments in Caughron applicable to our review of the issue herein:

> Defendant was not precluded from developing his theory, although it was not done in the detailed, point by point manner his counsel preferred; and the court did not prohibit any testimony that was shown to be relevant. Furthermore, the court's actions did not reflect the trial court's views on the Defendant's innocence or its opinion of the merit of Defendant's proof.

Id. Despite waiving consideration of the issue, the Appellant has otherwise failed to prove an abridgment of his constitutional rights in this respect.

Similarly, the Appellant cannot succeed on his claim that trial counsel was ineffective for failing to request a mistrial after the trial judge asked counsel to move along with her questioning. The Appellant offers no argument in support of his claim regarding counsel's alleged deficiency in this respect. The Appellant has otherwise failed to show prejudice. His testimony at the post-conviction hearing was similar in nature to what he told the jury at trial.

## CONCLUSION

For the foregoing reasons, we conclude the Appellant failed to prove by clear and convincing evidence the individual allegations contained in his petition for post-conviction relief. The post-conviction court properly denied the Appellant relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
DAVID H. WELLES, JUDGE